COURT OF APPEALS
DECISION
DATED AND FILED

September 22, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1109**

Cir. Ct. No. **2018TP229**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT I**

IN RE THE TERMINATION OF PARENTAL RIGHTS TO K.C., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

   PETITIONER-RESPONDENT,

 V.

D.Q.,

   RESPONDENT-APPELLANT.

   APPEAL from an order of the circuit court for Milwaukee County: GWENDOLYN G. CONNOLLY, Judge. *Affirmed*.

¶1     DUGAN, J.[1]   D.Q. appeals the circuit court's order terminating his parental rights.   This court concludes that there is credible evidence to sustain the circuit court's finding that D.Q. is an unfit parent, and it concludes that the circuit court did not erroneously exercise its discretion in finding that terminating D.Q.'s parental rights was in K.C.'s best interests.   Thus, this court affirms.

## BACKGROUND

¶2     K.C. was born on July 22, 2015, to N.E.C.   D.Q. was aware of N.E.C.'s pregnancy within approximately two weeks after conception and suspected he was the father.   He visited N.E.C. and K.C. in the hospital the day after K.C. was born.   At the hospital, D.Q. noticed that K.C. was born with a genetic abnormality that he and other of his siblings were born with, thereby strengthening his suspicion that he was K.C.'s father.   Despite his suspicion, D.Q. refused N.E.C.'s request for him to take a paternity test at the time K.C. was born because "at the time [he] didn't really have time to go through all that," and he followed through with his plans to move to Texas in or around September of 2015.

¶3     Due to her own substance abuse and tendency towards violent behavior, N.E.C. was unable to provide a safe place for K.C. to live, and on July 31, 2015, K.C. was removed from N.E.C.'s care and placed in a foster home.   K.C. was subsequently found to be a child in need of protection or services (CHIPS) on August 26, 2015, and a dispositional order was entered on September 21, 2015, placing K.C. outside the parental home until either N.E.C. or K.C.'s father could meet certain conditions for K.C.'s return.   D.Q. was still living in Milwaukee,

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

Wisconsin, during much of this time but did not take any responsibility for K.C.'s care, despite his suspicion that he was K.C.'s father.

¶4 K.C. was returned to N.E.C.'s care on July 21, 2017, as a trial reunification under a CHIPS order of supervision. This order was extended on August 31, 2017. During the time that K.C. was placed with N.E.C., N.E.C. lived with J.B. as a couple. N.E.C. and J.B. had a son together, and J.B. was the primary care provider for both K.C. and K.C.'s half-brother. During the placement hearing, J.B. testified that he "did a lot." He described what he meant by "a lot" by saying, "[He] would help take care of [K.C.], change her diapers, you know, pick her up from day care, drop her off at day care, make sure she got dressed in the morning to go to day care, you know, watch her while [N.E.C.] would go to work …."

¶5 However, sometime in April of 2018, N.E.C. became intoxicated and violent, and J.B. and their son moved out of the home the couple shared. An emergency placement order was issued on May 14, 2018, following this incident, and K.C. was returned to foster care. The dispositional order placing K.C. in a foster home, which set forth certain conditions that N.E.C. had to meet before K.C. could be returned to N.E.C., was revised and extended on July 2, 2018. The July 2, 2018 order contained a notice concerning grounds to terminate parental rights, and the conditions for K.C.'s return. The conditions for K.C.'s biological father included that he undergo a Parental Capacities Family Assessment, participate in recommended treatment or services, make himself available for court hearings, become the legally adjudicated father, and maintain contact with K.C. As it applied to both parents, the conditions required that the parents provide safe care for K.C., which included such things as providing a safe and stable home environment.

¶6      After K.C. was returned to foster care, the State filed a petition to terminate the parental rights of N.E.C. and the "unknown" father.[2]  This petition was filed on September 25, 2018, and alleged grounds for termination under WIS. STAT. § 48.415(6) for a failure to assume parental responsibility.

¶7      N.E.C. appeared at the initial hearing on October 15, 2018, but the hearing was adjourned to November 12, 2018, to allow the public defender's office to appoint counsel for N.E.C.[3]  The hearing was adjourned a second time and rescheduled for December 3, 2018, when N.E.C. requested a substitution of the judge.

¶8      D.Q. was visiting family that November and reached out to N.E.C. N.E.C. brought D.Q. to a family drug treatment court where she informed Ms. Mariah Ahles, K.C.'s case manager from SaintA,[4] that D.Q. was K.C.'s father. Ms. Ahles informed D.Q. of the upcoming hearing on December 3, 2018.  D.Q. appeared at the December 3, 2018 hearing before the Honorable David Feiss, the newly assigned judge.  However, the December 3, 2018 hearing was adjourned yet again, for D.Q. to undergo paternity testing.

¶9      Paternity test results confirmed that D.Q. was the father, and the State filed an amended petition on January 8, 2019, identifying D.Q. as the father and

---

[2] The first page of the petition indicates that the father is unknown.  However, the petition later states that the "alleged father" is an individual by the first name of "Deandre" or "Deandro." The petition also notes that there is no Declaration of Paternal Interest on file with the State of Wisconsin Department of Children and Families.

[3] The Honorable Christopher Foley presided over the hearings that took place in October and November of 2018.

[4] SaintA is a human services agency that has a contract with the Division of Milwaukee Child Protective Services (DMCPS) to provide services to children.  *See* sainta.org.

alleging grounds for termination of parental rights as to both N.E.C. and D.Q. under both WIS. STAT. § 48.415(2) and (6), Continuing Need of Protection or Services and Failure to Assume Parental Responsibility, respectively.

¶10    D.Q. appeared with counsel for the hearing on the petition on February 7, 2019.[5] D.Q. contested the petition and requested a jury trial, which was then scheduled for September 30, 2019. Subsequently, on February 28, 2019, D.Q. filed a request to change K.C.'s placement to his mother's house.[6] On March 15, 2019, the circuit court held an evidentiary hearing addressing the change of placement and granted the State's request to place K.C. with J.B. K.C. remained with J.B. for the remainder of the proceedings.

¶11    The September 30, 2019 jury trial was delayed and moved to November 11, 2019. In preparation for the trial, the circuit court addressed pretrial matters on November 4 and 11, 2019. As a result of the circuit court's pretrial ruling regarding the application of WIS JI—CRIMINAL 324A,[7] on the following day, November 12, 2019, N.E.C. and D.Q. entered no contest pleas to the continuing CHIPS grounds alleged in the amended petition. The circuit court determined the pleas were entered knowingly and voluntarily and accepted them.

---

[5] The Honorable Gwen Connolly presided over the proceedings beginning with the February 28, 2019 hearing and issued the order from which D.Q. now appeals.

[6] The State previously filed a notice of change of placement for K.C. on November 7, 2018, seeking to change K.C.'s placement to J.B.'s home. N.E.C. contested this notice of placement, but she did not contest D.Q.'s notice of placement to his mother's house. K.C.'s guardian ad litem (GAL) supported the State's change of placement request to place K.C. in J.B.'s home.

[7] The jury instruction WIS JI—CRIMINAL 324A lists the elements that the State must prove to determine if a parent is unfit.

¶12 After accepting the no contest pleas, the circuit court took testimony to prove up the State's case. The State offered exhibits that were moved into evidence, including the August 2015 CHIPS finding and the dispositional orders related to K.C.'s CHIPS case. Ms. Ahles also testified on behalf of the State. Ms. Ahles testified as to the dates that K.C. was in the care of someone other than her parents and that the July 2018 dispositional order placing K.C. in care outside of a parental home "ha[d] been in place for over 15 months." She then confirmed that the notice concerning grounds to terminate parental rights required by WIS. STAT. § 48.356(2) was "attached to that dispositional order." Ms. Ahles additionally testified that the dispositional order contained conditions for each parent to meet to have K.C. returned to their care and testified that neither parent met those conditions.

¶13 As it relates specifically to D.Q., Ms. Ahles testified that she first learned of D.Q. in November of 2018, and upon learning about D.Q., she immediately began providing services to him in an effort to help him satisfy the conditions for K.C.'s return. Specifically, Ms. Ahles testified that, upon receipt of the paternity test results in December of 2018, she arranged a meeting with D.Q. on January 16, 2019, to arrange for D.Q. to undergo a Parental Capacity Assessment. Importantly, Ms. Ahles testified that D.Q. had not met with Ms. Ahles, had not started the process to become K.C.'s legally adjudicated father, and had not spent time with or visited K.C. until after the petition was filed. Ms. Ahles testified that it was her understanding that D.Q. "had only seen [K.C.] that first day after she was born at the hospital" but then "he had not been in [K.C.]'s life for three and half years," even though K.C. was being exposed to domestic violence and substance

abuse while living with N.E.C.[8] Ms. Ahles concluded her testimony by stating that she "ha[d] been ready, willing and able to refer [D.Q.] for services" had he come forward sooner in the process or if she "had anyway to contact him at all."

¶14 Pursuant to the testimony provided by Ms. Ahles and the documentary evidence, the circuit court found that the State had proven the continuing CHIPS grounds, by clear and convincing evidence, to establish that N.E.C. and D.Q. were unfit parents.

¶15 The dispositional hearing following this finding took place over the course of three days on January 13 and 15, 2020, and February 6, 2020. Over the course of these hearings, the circuit court took testimony from the individuals involved in K.C.'s life, including N.E.C., D.Q., D.Q.'s relatives, J.B., and Ms. Ahles. As a result of these hearings, the circuit court found that it was in K.C.'s best interests to terminate the parental rights of N.E.C. and D.Q. The circuit court considered D.Q.'s recent involvement in K.C.'s life, but it ultimately placed more weight on the testimony regarding J.B.'s significant and consistent role in K.C.'s life.

¶16 D.Q. now appeals the circuit court's order terminating his parental rights to K.C.

## DISCUSSION

¶17 "Wisconsin has a two-part statutory procedure for the involuntary termination of parental rights." *Steven V. v. Kelley H.*, 2004 WI 47, ¶24, 271

---

[8] N.E.C. has a history of alcohol and drug abuse as well as a history of violent behavior towards those around her. While living with J.B., N.E.C. had become intoxicated and violent towards J.B., resulting in J.B. moving out of the home.

Wis. 2d 1, 678 N.W.2d 856. In the first phase, called the grounds phase, "the petitioner must prove by clear and convincing evidence" that at least one of the twelve grounds enumerated in WIS. STAT. § 48.415 exists. *Steven V.*, 271 Wis. 2d 1, ¶¶24-25; *see also* WIS. STAT. § 48.31(1). In the second phase, often referred to as the dispositional phase, the court must decide if it is in the child's best interest that "the parent's rights be permanently extinguished." *Steven V.*, 271 Wis. 2d 1, ¶27*; see also* WIS. STAT. § 48.426(2);.

¶18 In his appeal, D.Q. argues that there is insufficient evidence to sustain the circuit court's finding in the grounds phase that he is an unfit parent. He puts forth two reasons as to why the evidence is insufficient: (1) he was never provided with the notice required by WIS. STAT. § 48.415(2)(a)1. and (2) the conditions for K.C.'s return were not narrowly tailored to his circumstances and thus impossible to comply with. In addition to his challenge to the sufficiency of the evidence in the first phase, D.Q. challenges the circuit court's finding in the dispositional phase. He argues that the circuit court erroneously exercised its discretion when it found that it was in K.C.'s best interests to terminate his parental rights. This court addresses each argument in turn.

### I. There is sufficient evidence to sustain the circuit court's finding in the grounds phase that D.Q. is an unfit parent

¶19 Under the grounds phase of the proceedings here, the State as the petitioner was required to prove by clear and convincing evidence that D.Q. was an unfit parent pursuant to WIS. STAT. § 48.415(2), the grounds in the petition to which D.Q. pled no contest. Section 48.415(2) provides:

> Continuing need of protection or services … shall be established by proving any of the following:
>
> (a) 1. That the child has been adjudged to be a child … in need of protection or services and placed, or continued in a

placement, outside his or her home pursuant to one or more court orders under s. 48.345, 48.347, 48.357, 48.363, 48.365, 938.345, 938.357, 938.363 or 938.365 containing the notice required by s. 48.356(2) or 938.356(2).

2. a. In this subdivision, "reasonable effort" means an earnest and conscientious effort to take good faith steps to provide the services ordered by the court which takes into consideration the characteristics of the parent or child[,] … the level of cooperation of the parent[,] … and other relevant circumstances of the case.

b. That the agency responsible for the care of the child and the family … has made a reasonable effort to provide the services ordered by the court.

3. That the child has been placed outside the home for a cumulative total period of 6 months or longer pursuant to an order listed under subd. 1 … and that the parent has failed to meet the conditions established for the safe return of the child to the home ….

¶20 D.Q. challenges the evidence put forth by the State to prove the notice requirement found in WIS. STAT. § 48.415(2)(a)1. and to prove his failure to satisfy the conditions to allow him to care for K.C. "Our standard of review in a challenge to the sufficiency of the evidence is whether there is any credible evidence to sustain the verdict." *St. Croix Cty. DHHS v. Michael D.*, 2016 WI 35, ¶29, 368 Wis. 2d 170, 880 N.W.2d 107. Our review also requires statutory interpretation, "which is a question of law we review de novo." *Id.*, ¶15.

¶21 WISCONSIN STAT. § 48.415(2)(a)1. requires that a court order, under one of the listed statutes, contains the notice required by WIS. STAT. § 48.356(2). The notice required by WIS. STAT. § 48.356(2) is a notice to the parents of any grounds for the termination of parental rights and the conditions necessary to have the child returned. "The plain language of § 48.415(2) requires that in a [termination of parental rights] case where the underlying ground to terminate is based on continuing CHIPS, the statutory notice requirements are satisfied when at

least *one* of the CHIPS orders contains the written notice required under § 48.356(2)." ***Michael D.***, 368 Wis. 2d 170, ¶24. Thus, when our supreme court addressed whether there was sufficient evidence to satisfy the notice requirement, it concluded that there was sufficient evidence to meet the first element, "the notice element," when one of the court orders "contained the written notice prescribed by statute." ***Id.***, ¶30.

¶22    In this case, the July 2, 2018 order contained a notice of grounds to terminate parental rights and the conditions for K.C.'s return, *i.e.*, the notice required by WIS. STAT. § 48.356(2). This order was moved into evidence at the prove up hearing. Furthermore, Ms. Ahles confirmed through her testimony that the notice was attached to the dispositional order. Accordingly, this court concludes that there is credible evidence to satisfy the notice element in WIS. STAT. § 48.415(2)(a)1.

¶23    D.Q. additionally argues there was insufficient evidence to support the circuit court's finding that he is unfit because it was impossible for him to comply with the conditions to have K.C. returned to his care due to the fact that the conditions were not narrowly tailored to his circumstances. D.Q. argues that he just now took a paternity test to prove that he is K.C.'s father and could not have complied with the conditions until after the results of the test. In other words, D.Q. appears to argue it was impossible for him to comply with any conditions because he was not aware that K.C. was his daughter. This court disagrees.

¶24    To satisfy the conditions, D.Q. was required to undergo a Parental Capacities Family Assessment, participate in recommended treatment or services, make himself available for court hearings, become the legally adjudicated father,

and maintain contact with K.C. He was also required to provide safe care for K.C., which included such things as providing a safe and stable home environment.

¶25 As Ms. Ahels testified at the prove up hearing, by the time the amended petition was filed on January 8, 2019, D.Q. had completed none of these conditions, some of which would have required minimal effort on D.Q.'s part. In her testimony, Ms. Ahles did acknowledge that D.Q. accepted limited services from her to satisfy the conditions for K.C.'s return after the amended petition was filed.

¶26 However, Ms. Ahles testimony at the prove up hearing also indicates that D.Q. visited K.C. in the hospital when she was born and was aware of K.C.'s existence, yet D.Q. was not a part of K.C.'s life and did not make himself available for any services Ms. Ahels' could provide until now. Furthermore, Ms. Ahles also testified to the fact that she "ha[d] been ready, willing and able to refer [D.Q.] for services" to work on satisfying the conditions for K.C.'s return from the time the conditions were imposed. Indeed, as soon as D.Q. stepped forward as K.C.'s father, Ms. Ahles immediately scheduled a meeting with D.Q. to begin providing services to him although it was past the filing of the amended petition. However, even considering D.Q.'s efforts past this date, it is clear that D.Q. still had not participated in all the services offered and recommended by Ms. Ahles nearly a year after the paternity test and still had not satisfied the conditions of K.C.'s return.

¶27 D.Q. compares his situation to *Kenosha Cty. DHS v. Jodie W.*, 2006 WI 93, 293 Wis. 2d 530, 716 N.W.2d 845, and argues that the conditions for K.C.'s return were not narrowly tailored to his situation and particular needs and were, therefore, impossible for him to meet. Simply put, this court does not see this as a case with impossible conditions of return.

11

¶28 In *Jodie W.*, our supreme court reversed a circuit court's finding that a mother was unfit because it was impossible, due to her incarceration, for the mother to comply with the court-ordered condition that she obtain suitable housing for her child's return. *See id.*, ¶56. The court concluded that, in the case of a parent's incarceration, "the court-ordered conditions of return are tailored to the particular needs of the parent and child." *Id.*, ¶51. The court then went on to recognize that the mother had cared for her son for the first two years of his life without the need for services and that she had a substantial relationship with her son because of the care she had already provided to him. *Id.*, ¶53. The court also recognized "that Jodie made significant progress toward meeting many of the other conditions of return." *Id.*, ¶54. As applied to Jodie W., the condition requiring her to obtain housing while she was incarcerated violated her right to substantive due process because it was not narrowly tailored to account for her circumstances. *Id.*, ¶55.

¶29 That is not the case here. Following *Jodie W.*'s lead and taking into account D.Q.'s circumstances and particular needs, this court concludes that it was not impossible for D.Q. to satisfy the court-ordered conditions or for the responsible agency (here the DMCPS) to provide him services. As Ms. Ahles testified, D.Q. was aware of K.C.'s existence from the time of her birth but was not a part of K.C.'s life until she was nearly three and a half years old. Her testimony also showed that during D.Q.'s extended absence, K.C. was exposed to domestic violence and substance abuse at the hands of N.E.C. and that K.C. spent the majority of her life in foster care. Ms. Ahles testimony shows that no services were provided to D.Q. until recently because he was entirely absent from K.C.'s life. Any impossibility in D.Q.'s ability to satisfy the court-ordered conditions or to receive services from DMCPS was of his own doing. He maintained no contact with K.C. and did not

make himself available to be a part of her life, as the conditions required. The conditions imposed on D.Q. could not have been any more narrowly tailored to meet his circumstances when the circumstance was that D.Q. chose not to be part of K.C.'s life.

¶30  In sum, this court concludes that there is credible evidence to sustain the circuit court's finding under the grounds phase that D.Q. is an unfit parent.

## II. The circuit court did not erroneously exercise its discretion in finding that terminating D.Q.'s parental rights were in K.C.'s best interests

¶31  This court will uphold the circuit court's decision to terminate parental rights "if there is a proper exercise of discretion." *See State v. Margaret H.*, 2000 WI 42, ¶32, 234 Wis. 2d 606, 610 N.W.2d 475. This requires that the circuit court applied the correct standard of law to the facts of the case. *Id.* In making its determination, "the best interests of the child is the paramount consideration" for the circuit court. *Id.*, ¶33. To establish this, the circuit court should reference the factors set forth in Wis. Stat. § 48.426(3), and any other factors it relied upon, in explaining on the record the basis for the disposition. *Sheboygan Cty. DHHS v. Julie A.B.*, 2002 WI 95, ¶30, 255 Wis. 2d 170, 648 N.W.2d 402. The factors to be considered are:

> (1) "The likelihood of the child's adoption after termination."
>
> (2) "The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home."
>
> (3) "Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships."
>
> (4) "The wishes of the child."

(5) "The duration of the separation of the parent from the child."

(6) "Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements."

WIS. STAT. § 48.426(3).

¶32    The circuit court structured its finding in the dispositional phase of the proceedings according to the factors contained in WIS. STAT. § 48.426(3) and provided a detailed analysis of each factor on the record.  Under the first factor, the circuit court noted that J.B. "had been a caregiver in [K.C.]'s life … since she was about six months old" and had testified that "he is prepared to adopt [K.C.]"  The circuit court, therefore, found that K.C. was "highly adoptable" upon the termination of parental rights and placed significant weight on this factor.

¶33    As it relates to the second factor, the circuit court found that K.C. has behavioral issues.  In addressing K.C.'s behavioral issues, the circuit court found it significant that J.B. has regularly and actively participated in K.C.'s therapy and that "she was doing very well now in part because of her response to therapy and the support she receives from [J.B.]"  Also, as D.Q. testified at the dispositional hearing, he was not a part of K.C.'s therapy, and he was not even aware that K.C. was in therapy.  The circuit court then found that this factor weighs in favor of terminating parental rights.

¶34    The circuit court then addressed the third factor and found that, even though D.Q.'s visits with K.C. had gone well, K.C. did not have a substantial relationship with D.Q.  Addressing the fourth factor, the circuit court did not place much weight on the fourth factor given that K.C. was only four years old.  Then it

considered the fifth factor, and the circuit court did find it significant that D.Q. was absent from K.C.'s life for the first three years. The circuit court stated, "This evidence I think demonstrates that essentially this child has been separated from both of her biological families …." The circuit court found that these factors weighed in favor of terminating parental rights.

¶35 Finally, under the sixth factor, the circuit court found that K.C.'s life would be more stable if N.E.C.'s and D.Q.'s parental rights were terminated. The circuit court found it significant that K.C. was already under J.B.'s care, and had been in J.B.'s care in the past. The circuit court did, however, recognize D.Q. was recently involved in K.C.'s life, but it also recognized that D.Q.'s testimony showed a lack of commitment to K.C.: "[D.Q.]'s testimony is he doesn't have time for individual therapy. He doesn't have time to go and do the random UAs which would then really very clearly demonstrate that he not using alcohol or other substances improperly." Thus, the circuit court found that this factor weighs in favor of terminating parental rights.

¶36 In the end, the circuit court found it was in K.C.'s best interests to terminate D.Q.'s parental rights, despite the fact that D.Q. now has a limited role in K.C.'s life. The circuit court made a lengthy record weighing the factors under WIS. STAT. § 48.426(3) and applied the proper legal standard to the facts of the case. Accordingly, this court concludes that the circuit court properly exercised its discretion when assessing the factors at the dispositional phase of the proceedings and finding that the termination of parental rights was in K.C.'s best interests.

## CONCLUSION

¶37 This court concludes that there is sufficient evidence to support the circuit court's finding that grounds exist under WIS. STAT. § 48.415(2) to find D.Q.

15

is an unfit parent. This court also concludes that the circuit court properly exercised its discretion in the dispositional phase of the proceedings when it found that terminating D.Q.'s parental rights was in K.C.'s best interests. This court, therefore, affirms the order of the circuit court terminating D.Q.'s parental rights.

*By the Court.*—Order Affirmed.

This order will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.